# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 3:09—cv—106 |
| BARKI, LLC, a North Carolina limited liability company, and BRUCE C. KRAMER, an individual, | ) ) ) ) | |
| Defendants, and | ) ) | |
| RHONDA A. KRAMER, an individual, and FOREST GLEN FARM, LLC, a North Carolina limited liability company, | ) ) ) ) | |
| Relief Defendants. | ) ) | |

## ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

On March 17, 2009, the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") filed its Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("Complaint") charging Bruce C. Kramer ("B. Kramer") with fraudulent solicitation, misrepresentations, false statements, and misappropriation of funds in connection with at least $38 million from 79 customers for the purported purpose of trading off-exchange foreign currency ("forex" or "foreign currency"), from June 2004 through February 2009 ("relevant period"), all in violation of Section 4b(a)(2)(A)-(C) of the Commodity Exchange Act ("the Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-

246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C). The Complaint further charged Defendant Barki, LLC ("Defendant" or "Barki") with liability for the violations of the Act committed by its agent B. Kramer, pursuant to Section 2(a)(1)(B) of Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation ("Regulation") 1.2, 17 C.F.R. § 1.2 (2010). In addition, the Complaint claimed that Relief Defendant Forest Glen Farm, LLC ("Relief Defendant" or "Forest Glen"), *et al.*, who was not charged with violations of the Act, received funds and assets from Barki and its agent, B. Kramer, to which Forest Glen held no legitimate interest or entitlement and which were derived from B. Kramer's fraudulent and violative acts while working on behalf of Barki.

Barki was properly served with the summons and Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 4(h) via delivery upon its registered agent, Albert Stuart McKaig, on March 17, 2009. [Docket Entry ("DKT.") #11]. Forest Glen was properly served with the summons and Complaint pursuant to Fed. R. Civ. P. 4(h) via delivery upon its registered agent at the time, Albert Stuart McKaig, on March 17, 2009. [DKT. #12].

Neither Barki nor Forest Glen has appeared or answered the Complaint within the time permitted by Fed. R. Civ. P. 12(a)(1); accordingly, the Commission filed motions for entry of a clerk's default against Defendant Barki and Relief Defendant Forest Glen. [DKT. #198, DKT. #199]. The Clerk of this Court entered a default against Barki on December 7, 2010 and Forest Glen on December 8, 2010. [DKT. #200, DKT. #201].

The Commission has moved this Court to grant final judgment by default against Defendant Barki, order permanent injunctive relief, and impose a restitution obligation and civil monetary penalty. The Commission has further moved to grant final judgment by default against

Relief Defendant Forest Glen and order disgorgement of benefits received from conduct constituting violations of the Act. Based upon the Commission's memorandum in support of its motion, the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final Judgment By Default, Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief against Defendant Barki and Relief Defendant Forest Glen is GRANTED and judgment by default, permanent injunction, restitution, civil monetary penalty, and disgorgement is hereby entered. Accordingly, the Court enters the following findings of fact and conclusions of law:

**I.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay. The Court therefore further directs the entry of findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction and Other Ancillary Relief ("Order") pursuant to Section 6c of the Act, as set forth herein.

**A.     Jurisdiction and Venue**

1.   The Court has jurisdiction over the transactions at issue in this case pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2), for conduct that occurred on or after June 18, 2008, the date of enactment of the CRA. Section 6c(e) of the Act, 7 U.S.C. § 13a-1 (2006), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a

violation of any provision of the Act or any rule, regulation, or order promulgated thereunder. Section 2(c)(2) of the Act confers upon the Commission jurisdiction over certain retail transactions in forex for future delivery, including the transactions alleged in the Complaint.

2. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Barki and its agent, B. Kramer, are found in, inhabit, or transact business in this District, and/or the acts and practices in violation of the Act and Regulations have occurred within this District.

**B.    Plaintiff**

3. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended by the CRA, and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), 7 U.S.C. § 1 *et. seq*., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C.    Defaulting Parties**

4. Defendant **Barki, LLC** is a North Carolina limited liability company formed on June 14, 1999, with its principal place of business at 5917 Foxcrest Drive, Mint Hill, North Carolina, 28227 for the time period of August 2002 through April 2007 and at 9939 Troutman Road, Midland, North Carolina, 28107 thereafter. Barki has never been registered with the Commission in any capacity. Barki is not a financial institution, registered broker or dealer (or their associated person), insurance company, bank holding company, or investment bank holding company. Albert Stuart McKaig is Barki's registered agent; Barki's two member-managers for

the relevant period were B. Kramer and Rhonda Kramer ("R. Kramer").

5.   Relief Defendant **Forest Glen** was a North Carolina limited liability company, with the same principal place of business as the principal place of business of Barki during the relevant period.  Forest Glen was formed in September of 2006.  Forest Glen has never been registered with the Commission in any capacity.  Forest Glen's two member-managers for the relevant period were B. Kramer and R. Kramer.  Barki's agent B. Kramer, R. Kramer, and Forest Glen had no significant source of income during the relevant period other than Barki.  Barki's agent B. Kramer and R. Kramer used $1.35 million in Barki customer funds derived from Barki's agent B. Kramer's fraudulent and violative acts to purchase a horse farm and a residence in the name of Relief Defendant Forest Glen.

**D.     Other Parties**

6.   **Bruce C. Kramer** resided in Midland, North Carolina, was a member-manager of Barki since 1999, and acted as an agent for Barki for the relevant period.  B. Kramer had been a member-manager of Relief Defendant Forest Glen since September 2006.  B. Kramer had never been registered with the Commission.  On February 25, 2009, B. Kramer died.

7.   Relief Defendant **Rhonda A. Kramer** resided in Midland, North Carolina at the time of the filing of the Complaint.  R. Kramer had been a member-manager of Defendant Barki since June 1999 and a member-manager of Relief Defendant Forest Glen since September 2006.  She has never been registered with the Commission.  R. Kramer is the widow of Barki's agent, B. Kramer.

**E.     Findings of Fact**

**Barki's agent B. Kramer's Solicitation of Over $38 Million from Customers to Trade Forex**

8. In June 1999, B. Kramer formed Barki to engage in financial management, consulting, and trading. For the relevant period, Barki had two member-managers, B. Kramer and his wife, R. Kramer, each holding a 50% ownership interest in Barki. During the relevant period, B. Kramer and R. Kramer had no other significant source of income.

9. Throughout the relevant period, Barki's agent, B. Kramer, on behalf of Barki, solicited, directly or indirectly, at least 79 individuals and entities to trade foreign currency through Barki.

10. At least certain of Barki's customers were individuals who each had total assets of less than $5 million.

11. In his oral solicitations on behalf of Barki, B. Kramer, directly and through others, represented that as Barki's agent he would trade foreign currency using a proprietary trading system developed by B. Kramer. B. Kramer, who claimed to be an expert mathematician, told customers and prospective customers that his trading system was a software program that allowed him to evaluate market trends and situations, aiding him in making successful trades.

12. B. Kramer, on behalf of Barki, claimed great success trading foreign currency, boasting to customers and prospective customers that Barki and its agent, B. Kramer, never had a month wherein they lost money. B. Kramer touted his years as a successful trader for himself and for Barki, claiming to one customer that he had "never lost a dollar of principal."

13. B. Kramer, on behalf of Barki, directly and through others, also represented to prospective customers that B. Kramer's trading program involved very little risk because it prevented big losses, thereby limiting customers' exposure to risk, and that trading foreign currency with Barki was safer than investments in stocks.

14. B. Kramer, on behalf of Barki, also informed prospective customers that B. Kramer would earn a fee that would be a set percentage based on customers' supposed earnings.

15. B. Kramer, on behalf of Barki, provided prospective customers with a Barki trading agreement for them to execute (the "Trading Agreement"). The Trading Agreement provided that all funds would be traded through Barki and that customers would receive monthly statements and a year-end "K-1" showing any profits or losses allocated to the customers. The Trading Agreement also provided that B. Kramer's fee would vary depending upon the amount of customers' supposed earnings. For yearly customer profits up to 100%, B. Kramer's percentage of profits would be 20%; B. Kramer was further entitled to half of customer profits over 100% for any year.

16. The Trading Agreement also reinforced Barki's agent B. Kramer's claims concerning the low risk and high profitability of B. Kramer's proprietary system and indicators, stating that B. Kramer's system "works equally well in both up and down markets."

17. Customers and prospective customers relied on Barki's agent B. Kramer's misrepresentations in making their decisions to invest with Barki and its agent, B. Kramer.

18. B. Kramer, on behalf of Barki, instructed Barki's customers to write checks or send money directly to a bank account in the name of Barki. B. Kramer and R. Kramer were signatories on the Barki bank accounts during the relevant period.

**B. Kramer, Trading Forex on Behalf of Barki, Sustained Net Losses of $10 Million**

19. Between January 2003 and September 2008, B. Kramer, on behalf of Barki, opened four trading accounts at Forex Capital Markets, LLC ("FXCM"), a registered Futures Commission Merchant, in the name of Barki. Barki's agent B. Kramer opened these accounts as corporate proprietary trading accounts.

20. In these FXCM accounts, B. Kramer traded foreign currency on behalf of Barki on a margined or leveraged basis. The foreign currency transactions conducted by Barki's agent, B. Kramer, at FXCM neither resulted in delivery within two days nor created an enforceable

obligation to deliver between a seller and a buyer that had the ability to deliver and accept

delivery, respectively, in connection with their lines of business. Rather, these foreign currency

contracts remained open and were, ultimately, offset without anyone making or taking delivery

of actual currency (or facing an obligation to do so).

21. Of the over $38 million solicited by B. Kramer for Barki, only $17.6 million was

deposited into the Barki trading accounts at FXCM.

22. Contrary to B. Kramer's misrepresentations, Barki and its agent, B. Kramer, were not

successful foreign currency traders. In the Barki trading accounts at FXCM, Barki, through the

acts of B. Kramer, sustained trading losses of over $10 million and withdrew approximately $6.9

million which was not returned to Barki customers. In fact, Barki and its agent, B. Kramer,

sustained trading losses almost every single month for almost a 6 year period. Over $575,000

remained in the FXCM trading accounts when the Complaint was filed.

**Barki's agent, B. Kramer, Used Remaining Barki Customer Funds to Pay Customers and
For Personal Expenses**

23. Barki's agent B. Kramer misappropriated customer funds that were not deposited into the FXCM trading

accounts to over $20 million in pay purported profits and to return principal to Barki customers. Barki's agent B.

Kramer also misappropriated funds that he withdrew from the FXCM trading accounts to finance the personal

expenses of B. Kramer and R. Kramer, such as the $1.35 million purchase of the 48-acre horse farm and

6,000 square foot residence for Forest Glen, luxury automobiles including a Maserati, artwork, a

race horse, and extravagant parties. Working within the scope of his employment with Barki,

Barki's agent B. Kramer misappropriated at least $28 million.

24. Forest Glen's two member-managers for the relevant period were B. Kramer and R.

Kramer. Barki's agent B. Kramer, R. Kramer, and Forest Glen had no significant source of

income during the relevant period other than Barki. Despite receiving $1.35 million in Barki

customer funds that were obtained through Barki's agent B. Kramer's fraudulent and violative acts, Relief Defendant Forest Glen did not provide any legitimate services for Barki or have any legitimate entitlement to the funds it received from Barki or its agent, B. Kramer.

**Barki's Agent, B. Kramer, Concealed Losses and Misappropriation With False Statements**

25. Barki's agent B. Kramer through false representations and statements, concealed the unsuccessful trading and misappropriation by providing oral and written reassurances that Barki and its agent, B. Kramer, were profitably trading forex on behalf of Barki customers. Barki's agent B. Kramer sent false monthly account statements to Barki customers showing consistent returns of at least three to four percent.

26. Barki's agent B. Kramer never reported a losing month to Barki customers even though B. Kramer's actual trading on behalf of Barki resulted in net losses in almost every month.

27. B. Kramer, on behalf of Barki, also reported on the monthly statements to Barki customers debits from the individual customer's accounts of 20% management fees for B. Kramer earned on fictional trading profits.

28. Relying on the consistently profitable monthly and annual account statements, existing customers invested additional funds with Barki. In addition, prospective customers decided to invest with Barki after hearing of the consistent monthly returns existing customers were achieving.

29. To further conceal and perpetuate the fraud, Barki's agent B. Kramer told certain customers that Barki held approximately $59 million in the Barki trading accounts at FXCM when in fact Barki held, at most, $1 million in those accounts. Barki's agent B. Kramer supported the $59 million claim to certain customers by creating fictitious FXCM trading records.

30. Despite the trading losses and the unaccounted-for funds, Barki's agent B. Kramer professed to Barki's customers that customers' funds would be returned if so requested. These statements were false. Barki did not possess sufficient funds to return each customer's principal and purported investment returns.

31. B. Kramer, while working in the scope of his employment with Barki, failed to disclose to Barki's customers and prospective customers that he was operating Barki akin to a classic Ponzi scheme and misappropriating Barki customer funds.

32. On February 25, 2009, B. Kramer died and the fraud became known.

33. Neither Barki nor Forest Glen has appeared or answered the Complaint.

F.     Conclusions of Law

        i)     Barki's and Forest Glen's Failure to Answer Warrants Entry of Default Judgment

34. When a party against whom a default judgment is sought has failed to plead or otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's default. Fed. R. Civ. P. 55(a). The party seeking the default shall then apply to the court for a default judgment. Fed. R. Civ. P. 55(b).

35. Entry of default judgment is left to the sound discretion of the trial court. *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (granting default judgment for permanent injunction, disgorgement and a civil monetary penalty where defendant failed to answer complaint alleging securities fraud and misappropriation). While the Fourth Circuit has a strong policy that cases should ordinarily be decided on the merits, *see United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993), default judgment is appropriate when the adversary process has been halted because of an unresponsive party. *Lawbaugh*, 359 F. Supp. 2d at 421 (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

36. Upon default, the well-pled allegations in the complaint are to be taken as true for purposes of establishing liability. *Lawbaugh*, 359 F. Supp. 2d at 422; *see also Holland v. New Country Mining, Inc.*, No. 01:06-0626, 2006 U.S. Dist. LEXIS 88372, at *6 (S.D. W.Va. Dec. 6, 2006) (where defendant has not pled or otherwise defended himself in an action, all averments in the complaint are deemed admitted); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (defaulting defendant admits plaintiff's well-pled allegations of fact).

37. Defendant Barki and Relief Defendant Forest Glen have not responded to the Complaint, have not attempted to dispute or defend against the allegations in the Complaint, and have not otherwise appeared in this action. Accordingly, entry of final judgment by default against Defendant Barki and Relief Defendant Forest Glen is

wholly appropriate in this case.

    ii)  B. Kramer Violated Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C), and Barki is Derivatively Liable for these Violations

38.  Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C), makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for or, in the case of paragraph (2), with the other person.

Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, applies to Barki's agent, B. Kramer's, foreign currency transactions "as if" they were a contract of sale of a commodity for future delivery. Section 2(c)(2)(C)(iv) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv).

39. B. Kramer, on behalf of Barki, made misrepresentations and omissions of material fact, issued or caused to be issued false reports and statements, and misappropriated customer funds, and by such acts, violated Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA. *See CFTC v. King*, No. 3:06-CF-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (citing *CFTC v. R.J. Fitzgerald & Co.*, 310 F. 3d 1321, 1328 (11th Cir. 2002)).

40. As set forth above, from at least June 2004, in or in connection with foreign currency contracts, made, or to be made, for or on behalf of, or with, other persons, Barki's agent, B. Kramer, through his acts and omissions on behalf of Barki, violated Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, when, as Barki's agent, he knowingly misrepresented to customers that, among other things, (i) all Barki customer funds would be used and were used to

trade forex; (ii) Barki customers would and did receive returns on their forex investments of at least three to four percent a month (or the equivalent of an annual rate of return between 35 and 40 percent)) because of the success Barki enjoyed trading forex; and (iii) Barki had sufficient funds on hand to return all customers' principal. In actuality, only $17.6 million of the at least $38 million solicited by Barki's agent, B. Kramer, to trade forex was actually used to trade forex. Barki's agent, B. Kramer, failed to disclose that he only deposited a portion of the customer funds into trading accounts and that he lost more than $10 million trading forex on behalf of Barki. Barki's agent, B. Kramer, further failed to disclose that he was misappropriating Barki customer funds and that any returns on investment provided to Barki customers came from either existing Barki customers' original investments or money invested by subsequent Barki customers. In sum, Barki's agent, B. Kramer, failed to disclose that he was operating a Ponzi scheme in which he misappropriated millions of dollars of Barki customer funds and lost millions through trading.

41. Barki's agent, B. Kramer, violated Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, by misappropriating customer funds and using those funds to meet redemption requests of Barki customers or for B. Kramer's personal use. Misappropriation of customer funds constitutes "willful and blatant" fraud in violation of Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA. *See, e.g., CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000) (defendants violated Section 4b(a)(2)(i) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use), *aff'd sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002); *see also CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant violated Section 4b when he misappropriated pool participant funds by soliciting funds for trading and then

trading only a small percentage of those funds, while disbursing the rest of the funds to customers, herself, and her family); *CFTC v. King,* No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) ("King's violation of section 4b(a)(2)(i), (iii) of the CEA is further proven by his admitted misappropriation of customer funds for personal and professional use."); *CFTC v. McLaurin*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,768, U.S. Dist. LEXIS 9417, at *10-11 (N.D. Ill. July 3, 1996) (by depositing customer funds in accounts in which the customers had no ownership interest and making unauthorized disbursements for his own use, defendant violated Section 4b of the Act).

42. Barki's agent, B. Kramer, violated Section 4b(a)(2)(B) of the Act, as amended by the CRA, by providing false account statements to Barki customers which misstated the value of customer accounts and the profitability of B. Kramer's trading on behalf of Barki. Specifically, Barki's agent, B. Kramer, provided monthly and annual account statements that falsely represented that, based on B. Kramer's purported profitable forex trading on behalf of Barki, customers had earned profits each month. Barki's agent, B. Kramer, also created and showed to at least one customer fictitious FXCM trading records reflecting approximately $59 million in assets.

43. The making of false statements concerning profitability of trading violates Section 4b(a)(2)(B) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §6b(a)(2). *See, e.g., CFTC v. FX Prof'l Intern. Solutions, Inc.,* No. 1:10-cv-22311-PCH, 2010 WL 5541050 at *6 (S.D. Fla. Nov. 29, 2010) (delivering false account statements to customers regarding transactions regulated by the Commission constitutes a violation of Section 4b(a)(2)(B) of the Act, as amended); *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d at 686 (finding that defendants violated Section 4b(a)(i)-(iii) because they issued false account statements,

misappropriated customer funds, misrepresented profits and risks associated with foreign exchange currency contracts, and falsely characterized the experience of the firm's traders).

44. Barki's agent, B. Kramer, engaged in the acts and practices described above knowingly or with reckless disregard for the truth. Barki's agent, B. Kramer, made misrepresentations and omissions to Barki customers with the requisite scienter. When Barki's agent, B. Kramer, while working in the course and scope of his employment with Barki, made the above-described representations and issued the false written statements to Barki customers regarding their forex trading, lofty returns, and the ability to pay Barki customers, B. Kramer clearly knew such representations and statements were false. Barki's agent, B. Kramer, conducted the trading on behalf of Barki and was the sole person responsible for the handling of customer funds. Barki's agent, B. Kramer knew he was not successfully trading forex on behalf of Barki and that he was using customer funds to pay purported profits and return principal to existing customers. Accordingly, Barki's agent, B. Kramer, acted with the requisite scienter.

      iii) Barki is Liable Under Section 2(a)(1)(B) of the Act and Regulation 1.2 for the Violations of the Act Committed by Its Agent.

45. The foregoing acts, misrepresentations, omissions, and failures of B. Kramer occurred within the scope of his employment, office or agency with Barki; therefore, Barki is liable for these acts, misrepresentations, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

46. Each act of misappropriation, misrepresentation or omission of material facts, and making or causing to be made a false report or statement, including, but not limited, to those specifically alleged herein, is a separate and distinct violation of Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C).

      iv) Relief Defendant Is Not Entitled to Ill-Gotten Gains

47. "Federal courts may order equitable relief against a person who is not accused of wrongdoing . . . where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *CFTC v. Kimberlyn Creek Ranch*, 276 F.3d 187, 191-192 (4th Cir. 2002) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)) (applying nominal defendant status in a CFTC enforcement action). In *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991), the court found that it may grant equitable relief against a relief defendant if it is established that the relief defendant possesses property or profits illegally obtained, and the relief defendant has no legitimate claim to them.

48. Relief Defendant Forest Glen's two member-managers for the relevant period were B. Kramer and R. Kramer. Barki's agent B. Kramer, R. Kramer, and Forest Glen had no significant source of income during the relevant period other than Barki. Barki's agent B. Kramer and R. Kramer used $1.35 million in Barki customer funds derived from Barki's agent B. Kramer's fraudulent and violative acts to purchase a horse farm and a residence in the name of Relief Defendant Forest Glen. Despite receiving $1.35 million in Barki customer funds, Relief Defendant Forest Glen did not provide any legitimate services or have any legitimate entitlement to the funds it received from Barki or its agent, B. Kramer. Accordingly, Relief Defendant Forest Glen must disgorge $1.35 million of ill-gotten gains it received.

> v) Permanent Injunctive Relief Against Barki is Appropriate

49. The Commission is authorized to seek injunctive relief whenever it appears that any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order thereunder." Section 6c of the Act, 7 U.S.C. § 13a-1. "Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence," thus once a violation is

demonstrated, the Commission "need show only that there is some reasonable likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979). Moreover, "[a] likelihood of future violations may be inferred from past unlawful conduct." *CFTC v. British American Commodity Options Corp.*, 560 F.2d 135,142 (2d Cir. 1977).

50. Barki's agent, B. Kramer's, actions were not isolated to a single incident, but rather constituted a systematic program of deception and fraud perpetrated over several years. These facts demonstrate a reasonable likelihood of future violations. Permanent injunction is warranted to prevent further violations of the Act and Regulations.

> vi) Restitution and Disgorgement Are Appropriate Equitable Remedies in Commission Enforcement Actions

51. As discussed above, Section 6c of the Act, 7 U.S.C. § 13a-1§, authorizes the Commission to bring an action to enjoin violations of, and enforce compliance with the Act. In a civil enforcement action brought pursuant to Section 6c, the district court may order ancillary equitable relief that it deems appropriate, including restitution and disgorgement. *CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("it is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]"); *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760-61 (6th Cir. 1999) ("[r]estitution and disgorgement are part of the court's traditional equitable authority"); *Co Petro*, 680 F.2d at 582-84 ("unless a statute specifically or by inescapable inference commands the contrary, we are not to deny the inherent equitable powers of a court to afford complete relief").

**Restitution by Defendant**

52. The object of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred. *Porter v. Warner Holding Co.*, 328 U.S.

395, 402 (1946) (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant"); *United States v. Long*, 537 F.2d 1151, 1153 (4th Cir. 1975) (restitution consists of restoring the injured party "to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money") (quoting Restatement of Restitution, § 1, Comment: a, at 12 (1937)); *see also SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 74-75 (5th Cir. 1993) ("[r]estitution . . . has the goal of making the aggrieved party whole"); *First Penn Corp. v. FDIC*, 793 F.2d 270, 272 (10th Cir. 1986) ("[t]he object of restitution is to return the parties to the position that existed before the transaction occurred").

53. "Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *Noble Wealth*, 90 F. Supp. 2d at 693. *See also CFTC v. Marquis Fin. Mgmt. Systems, Inc.*, 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); *Rosenberg*, 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposits). *But see CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343-45 (11th Cir. 2008) (holding in a case involving fraudulent solicitation only, that the proper measure of restitution is the defendant's unjust enrichment).

54. Barki received $38,916,470 in customer funds. Of the total funds received by Barki, Barki returned $21,083,315 to customers. However, fourteen customers received payments from Barki in excess of their deposits; the total of the excess payments to these fourteen customers is $2,127,494. The difference between the total amount of customer funds Barki's agent B. Kramer solicited ($38,916,470), and the amount Barki's agent B. Kramer returned to customers less the excess funds ($18,955,821), is $19,960,649. Accordingly, as set forth in the Order below, Defendant Barki shall make restitution to Barki customers in the amount of $19,960,649,

plus post-judgment interest.

**Disgorgement by Relief Defendant**

55. Relief Defendant Forest Glen is not charged with violations of the Act but equitable relief is appropriate because Forest Glen received ill-gotten funds and it did not have a legitimate claim to those funds. *Kimberlyn Creek Ranch*, 276 F.3d at 191-93 (affirming the district court order freezing the assets of the relief defendants to preserve those assets for subsequent disgorgement); *SEC v. George*, 426 F.3d at 798-800 (affirming the district court order of disgorgement as to the relief defendants). Relief Defendant Forest Glen received at least $1.35 million in ill-gotten gains over the course of the Barki's agent B. Kramer's fraud. Accordingly, as set forth in the Order below, Relief Defendant Forest Glen shall disgorge $1.35 million in ill-gotten gains, plus post-judgment interest.

vii) Civil Monetary Penalty Against Barki is Appropriate

56. Section 6c(d)(1) of the Act provides "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation . . . a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. § 13a-1(d)(1). The Regulations adjust the statutory civil monetary penalty of $100,000 for inflation. 17 C.F.R. § 143.8. For the period at issue here, the statutory civil monetary penalty is as follows: $120,000 per violation for violations committed on or before to October 22, 2004; $130,000 per violation for violations committed between October 23, 2004 to October 22, 2008; and $140,000 per violation for violations committed on or after October 23, 2008. 17 C.F.R. §143.8(a)(2)(iii), (iv).

57. The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent. *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999).

"In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations." *Noble Wealth*, 90 F. Supp. 2d at 694. Conduct that violates the core provisions of the Act, such as customer fraud, should be considered extremely serious. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). In *JCC, Inc.*, the U.S. Court of Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system – such as manipulating prices or defrauding customers should be considered very serious even if there are mitigating facts and circumstances." *Id.* at 1571 (internal quotation marks and citation omitted). No mitigating facts or circumstances exist in case at bar. Barki's agent B. Kramer's fraudulent conduct resulted in Barki's enrichment by $6,981,569 in misappropriated customer funds from 79 customers.

58. In light of the conduct discussed above, the Court concludes that a serious and significant sanction is appropriate. Accordingly, Defendant Barki shall pay a civil monetary penalty of "triple the monetary gain to the person for each violation" pursuant to Section 6c(d)(1). *See CFTC v. Hayes*, 2007 WL 858772 at *5 (E.D. Va. Mar. 13, 2007) (imposing penalty of triple the monetary gain); *CFTC v. Premium Income Corp.*, 2007 WL 429092 at *14 (N.D. Tex. Jan. 26, 2007) (imposing penalty of triple the monetary gain, "as measured by triple the amount of customer funds received by [defendants], less the funds returned to customers, plus pre-judgment interest"). Defendant Barki profited $6,981,569 by virtue of its agent B. Kramer's fraud. Imposition of a civil monetary penalty of "triple the monetary gain" to Barki, or $20,944,707, represents an appropriate monetary penalty for the violations of which Barki is liable.

**II.**

## ORDER FOR RELIEF

**A.      Permanent Injunction**

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

59.  Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), Barki, in or in connection with any order to make, or the making of, any contract of sale of any commodity:

      a.   in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, or

      b.   for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of Section 5a(g) of the Act, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market,

is permanently restrained, enjoined and prohibited from directly or indirectly: cheating or defrauding or attempting to cheat or defraud any other person; and/or deceiving or attempting to deceive any other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of subparagraph (B) above, with the other person in violation of Section 4b(a) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a).

60.  Barki is permanently restrained, enjoined and prohibited from engaging, directly or indirectly, in:

      c.   trading on or subject to the rules of any registered entity (as that term is defined in Section 1aof the Act, to be codified at 7 U.S.C. § 1a;

d. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B), as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B), and/or 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified at 2(c)(2)(C)(i)) ("forex contracts") for his own personal account or for any account in which Barki has a direct or indirect interest;

e. having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on his behalf;

f. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

g. soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

h. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

i. acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

61. The injunctive provisions of this Order shall be binding upon Defendant Barki, upon any person who acts in the capacity of agent, employee, attorney, successor and/or assign of Barki and upon any person who receives actual notice of this Order, by personal service or otherwise, insofar as he or she is acting in active concert or participation with Barki.

**B. Restitution and Disgorgement**

**IT IS FURTHER ORDERED** that:

62. Barki shall pay restitution to its defrauded customers in the amount of $19,960,649, plus post-judgment interest ("Restitution Obligation").

63.  Barki's Restitution Obligation shall be reduced by: (a) amounts already distributed to its defrauded customers, pursuant to the Court's orders dated December 14, 2009 and September 30, 2010; and (b) amounts subsequently distributed by the Receiver pursuant to further orders of this Court.  Barki's Restitution Obligation shall also be reduced by any amounts of restitution paid directly by Barki, Forest Glen, B. Kramer, or R. Kramer to defrauded customers, upon a showing that such payments have been made.

64.  Relief Defendant Forest Glen shall disgorge or otherwise relinquish any legal or equitable right title, or interest it has in the assets or other property in the possession, custody, or control of the Receiver, as well as any legal or equitable right, title, or interest it has in any funds that have or will be obtained by the Receiver as the result of the sale of any receivership assets or other property.  Relief Defendant Forest Glen shall disgorge $1.35 million. [1]

65.  The sale of Forest Glen's farm and assets along with the collection of the proceeds by the Receiver shall satisfy Forest Glen's obligation as to this judgment.

66.  Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 18 U.S.C. § 1961.

67.  Effecting Payment of Funds: On March 24, 2009, the Court appointed Joseph A. Grier, III, as Receiver in this matter.  According to *The Receiver's Tenth Report*, the Receiver, to date, has collected $3,861,889.03 for the benefit of the Barki Receivership.  These funds, along with any interest earned on these funds, should be distributed to Barki's customers (less any court-approved fees and expenses not covered by Barki's assets in the possession of or recovered by the Receiver).  The Court orders that these funds be distributed to Barki's customers in

_____

[1]  Plaintiff Commodity Futures Trading Commission is not moving this court for disgorgement of the expenses paid for maintenance and care on behalf of Forest Glen during the relevant period.

accordance with the Receiver's distribution plan, which this Court has approved, and that

Barki's rights, if any, to the funds held by the Receiver be extinguished. [2]

68. Additional funds obtained through liquidation of Barki's and Forest Glen's assets and

property for restitution and disgorgement shall be made to the Receiver in the name "Barki

Receivership."

69. To the extent that any funds accrue to the U.S. Treasury as a result of the Restitution

Obligation, such funds shall be transferred to the Receiver for disbursement to Barki's defrauded

customers in accordance with the procedures set forth in the preceding paragraph.

70. Pursuant to Fed. R. Civ. P. 71, the customers of Barki are explicitly made intended third-

party beneficiaries of this Order and may seek to enforce obedience of this Order to obtain

satisfaction of any portion of the restitution which has not been paid by Barki.

### C. Civil Monetary Penalty

**IT IS FURTHER ORDERED that:**

71. Barki shall pay a civil monetary penalty in the amount of $20,944,707, plus post

judgment interest ("CMP Obligation").

72. Post-judgment interest on the CMP Obligation shall accrue beginning on the date of

entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date

of entry of this Order pursuant to 28 U.S.C. § 1961.

73. Barki shall pay this CMP Obligation by electronic funds transfer, U.S. postal money

order, certified check, bank cashier's check, or bank money order. If payment is to be made

other than by electronic funds transfer, the payment shall be made payable to the Commodity

Futures Trading Commission and sent to the address below:

---

[2] Pursuant to the Claims Order [DKT. 97], the First Interim Distribution Order [DKT. 137], and the Second Interim Distribution Order [DKT. 189], this Court previously approved the distribution of $3,082,200 of these funds.

Commodity Futures Trading Commission
Division of Enforcement
ATTN: Accounts Receivables – AMZ 340
E-mail Box: 9-AMC-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: 405-954-5644

If the payment is to be made by electronic funds transfer, Barki shall contact Linda Zurhorst

or her successor at the above address to receive payment instructions and shall fully comply with

those instructions. Barki shall accompany the payment of the penalty with a cover letter that

identifies Barki, and the name and docket number of this proceeding. Barki shall simultaneously

transmit copies of the cover letter and the form of payment to: (a) the Director, Division of

Enforcement, U.S. Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st

Street, NW, Washington, D.C. 20581, and (b) the Chief, Office of Cooperative Enforcement,

Division of Enforcement, at the same address.

### D. Provisions Related To Monetary Penalties And Partial Payments

74. Any acceptance by the Commission and/or Receiver of partial payment from Barki of

the Restitution Obligation and/or CMP Obligation shall not be deemed a waiver of Barki's

requirement to make further payments pursuant to this Order, or a waiver of the Commission's

right to seek to compel payment of any remaining balance.

75. Upon full satisfaction of Barki's Restitution and Civil Monetary Penalty obligation,

satisfaction of judgment will be entered as to Defendant Barki.

### E. Miscellaneous Provisions

76. All notices required to be given by any provision in this Order shall be sent certified

mail, return receipt requested, as follows:

Notice to Commission:

Director
Division of Enforcement
U.S. Commodity Futures Trading Commission
21st Street NW
Washington, DC 20581

77.  If any provision of this Order, or the application of any provisions or circumstances are held invalid, the remainder of the Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

78.  This Court shall retain jurisdiction of this action to ensure compliance with this Order for all other purposes related to this action.

**SO ORDERED.**

Signed: September 30, 2011

Graham C. Mullen
United States District Judge